J-S21007-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| ATEF V. JELASSI | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| NANCY NINEL VULAKH | |
| Appellant | No. 688 WDA 2016 |

Appeal from the Order April 15, 2016
In the Court of Common Pleas of Cameron County
Civil Division at No(s): 2013-1889

BEFORE: LAZARUS, J., DUBOW, J., and STRASSBURGER, J.[*]

MEMORANDUM BY LAZARUS, J.:                              **FILED MAY 30, 2017**

Nancy Vulakh appeals from the order, entered in the Court of Common Pleas of Cameron County, denying the petition to vacate the March 24, 2014 divorce decree, docketed on April 11, 2014. After our review, we affirm.

Vulakh and Atef Jelassi were married on July 28, 2005, in Las Vegas, Clark County, Nevada. Vulakh asserts that, unbeknownst to her, Jelassi married her to become a United States citizen. After he was sworn in as a citizen, Jelassi filed for divorce on November 7, 2013.

Attorney Douglas Grannan, who had assisted Jelassi with immigration matters, represented both parties in the divorce action. Although the parties had discussed a postnuptial agreement, and a postnuptial agreement was

_____

[*] Retired Senior Judge assigned to the Superior Court.

prepared, the agreement was never signed. After the trial court entered the divorce decree, Vulakh retained separate counsel, Attorney Justin Miller, who filed a petition to open the decree. Vulakh asserted that the divorce decree was obtained by fraud and that, as a result, she was deprived of significant assets.[1] Vulakh contends that since they had discussed and prepared a postnuptial agreement, she believed that when she signed the consent for divorce under 23 Pa.C.S.A. § 3301(c),[2] the post-nuptial agreement with respect to property distribution was incorporated into that decree. Vulakh argues that by signing the verification of the complaint, knowing it did not reflect their agreement, Jelassi perpetrated a fraud upon her and upon the court.

---

[1] The unsigned postnuptial agreement attached to Vulakh's petition references, *inter alia*, the transfer of Jelassi's interest, to Vulakh, in a property at 9819 Bonner Street, Philadelphia, a business (Aldo's Pizzarama) located at 10201 Bustleton Avenue, Philadelphia, and a ten-acre lot in Presidio County, Marfa, Texas.

[2] Section 3301(c) provides:

> **Mutual consent.**--The court may grant a divorce where it is alleged that the marriage is irretrievably broken and 90 days have elapsed from the date of commencement of an action under this part and an affidavit has been filed by each of the parties evidencing that each of the parties consents to the divorce.

23 Pa.C.S.A. § 3301(c).

The trial court held a hearing on January 6, 2016, at which Vulakh appeared, represented by Attorney Miller. Despite presumptive notice, Jelassi did not appear. Attorney Grannan appeared at the hearing as a witness; he was not representing Jelassi at that hearing.

Since the petition to open was filed well beyond the 30-day time period, *see* 42 Pa.C.S.A. § 5505, the court treated it as a petition to vacate. Following the hearing, the trial court denied the petition. This appeal followed.

Vulakh raises the following issues for our review:

1. Whether the trial court erred and abused its discretion in denying [Vulakh's] [p]etition to [o]pen [d]ivorce [d]ecree?

2. Whether the trial court erred and abused its discretion in determining [Vulakh] did not present sufficient evidence of extrinsic fraud to justify opening the divorce decree?

Appellant's Brief, at 4.

In addition to the trial court's inherent authority to rescind, modify, or reconsider its orders, 42 Pa.C.S.A. § 5505, the legislature has also provided trial courts with additional equity powers in divorce proceedings. Section 3323(f) of the Divorce Code provides:

In all matrimonial causes, the court shall have full equity power and jurisdiction and may issue injunctions or other orders which are necessary to protect the interests of the parties or to effectuate the purposes of this part and may grant such other relief or remedy as equity and justice require against either party or against any third person over whom the court has jurisdiction and who is involved in or concerned with the disposition of the cause.

23 Pa.C.S.A. § 3323(f).  One of the purposes of the Divorce Code is to "effectuate economic justice between parties who are divorced or separated . . .  and insure a fair and just determination and settlement of their property rights."  23 Pa.C.S.A. § 3102(6).  The equitable powers of the court, however, are not without limits.  Section 3331 sets forth the circumstances under which a court may exercise its discretionary power to open or vacate a decree:

> A motion to open a decree of divorce or annulment may be made only within the period limited by 42 Pa.C.S. § 5505 (relating to modification of orders) and not thereafter. The motion may lie where it is alleged that the decree was procured by intrinsic fraud or that there is new evidence relating to the cause of action which will sustain the attack upon its validity. A motion to vacate a decree or strike a judgment alleged to be void because of extrinsic fraud, lack of jurisdiction over the subject matter or a fatal defect apparent upon the face of the record must be made within five years after entry of the final decree. Intrinsic fraud relates to a matter adjudicated by the judgment, including perjury and false testimony, whereas extrinsic fraud relates to matters collateral to the judgment which have the consequence of precluding a fair hearing or presentation of one side of the case.

23 Pa.C.S.A. § 3332.

As this Court stated in **Justice v. Justice**, 612 A.2d 1354 (Pa. Super. 1992), "section [3332][3] sets out clear evidentiary requirements which must be met by the parties before the court may exercise its authority to open, vacate, or strike a divorce decree[.]"  **Id.** at 1358 (citation omitted).  The

---

[3] Previously 23 P.S. § 602.

intent of this section was "to codify the extraordinary circumstances which will outweigh the interests of the parties and the court in finality[.]" *Anderson v. Anderson*, 544 A.2d 501, 505 (Pa. Super. 1988).

Thus, the trial court was empowered to exercise its equitable powers only if Vulakh demonstrated that Jelassi had secured the decree through the use of extrinsic fraud. *See Fenstermaker v. Fenstermaker*, 502 A.2d 185, 186 (Pa. Super. 1985). Extrinsic fraud is defined as follows:

> [S]ome act or conduct of the prevailing party which has prevented a fair submission of the controversy. Among these are the keeping of the defeated party away from court by false promise or compromise, or fraudulently keeping him in ignorance of the action. Another instance is where an attorney without authority pretends to represent a party and corruptly connives at his defeat, or where an attorney has been regularly employed and corruptly sells out his client's interest. The fraud in such case is extrinsic or collateral to the question determined by the court. The reason for the rule is that there must be an end to litigation; and, where a party has had his day in court and knows what the issues are, he must be prepared to meet and expose perjury then and there. Where the alleged perjury relates to a question upon which there was a conflict, and it was necessary for the court to determine the truth or falsity of the testimony, the fraud is intrinsic and is concluded by the judgment, unless there be a showing that the jurisdiction of the court has been imposed up, or that by some fraudulent act of the prevailing party the other has been deprived of an opportunity for a fair trial.

*Id*. at 502 A.2d at 188) (citations omitted).

At the hearing, Attorney Miller argued that while the divorce action was pending, it was Vulakh's understanding that the parties' agreement on property distribution in the postnuptial agreement would be included with

- 5 -

the "filings, including a count for equitable distribution to enable the Court to incorporate that as part of the final decree[.]" N.T. Hearing, 1/6/16, at 7. Attorney Miller stated: "[D]ue to some mix-up in Attorney Grannan's office, that was not how it was drafted. That was not how it was sent in." *Id.* He continued:

> So when my client actually signed those papers, she thought she was signing – agreeing that what they had drawn up as their distribution of property was what was going to be the final outcome of the case. Instead, all that went through was a Subsection (c) divorce and what the Court has received. She discovered this sometime later when her then ex-husband refused to sign any documents transferring the property as agreed. When she went back to see what had actually been filed, she discovered that none of the things that she understood were going to happen actually had happened. So it's our position that we don't think – and we're certainly not accusing Attorney Grannan of having any involvement in pulling one over on my client, but we think Mr. Jelassi certainly knew what he was doing and intentionally essentially tricked her into a divorce without any of the substantial amounts of property that she should have received. Because as it stands now, she's received nothing and he's retained everything.

*Id.* at 7-8.

Vulakh also testified at the hearing, stating that about a month or two after Jelassi took his citizenship oath, he told her, "We're done." *Id.* at 9. She also stated that she reviewed the divorce papers with Attorney Grannan, as well as the postnuptial agreement: "[W]e discussed that that was supposed to be incorporated together." *Id.* at 10. Vulakh testified as follows:

A: [I]n May of 2014, might have been around there, I called [Attorney Grannan] to find out if the divorce ha[d] been finalized – what's going on? Has it been sent out yet? Because the way we discussed it, it wasn't supposed to be sent out until [Jelassi] signed the postnuptial agreement, until he signed everything. And at that point [Attorney Grannan] said to me, I apologize, but my secretary wanted to be efficient and mailed the divorce decree out, so – without—as it turns out, without that – without the postnuptial.

Q: And at that point were you able to get [Jelassi] to agree to transfer any of the property that he agreed to transfer to you, outside the divorce?

A: He verbally agreed to it, but he hasn't done anything for it. He stopped paying the mortgage on the house that I'm living in. And unbeknownst to me I found out, when I got served at the door with papers, that the house is in foreclosure. And I've been going to court for the past year now almost trying to save it from foreclosure. And he still has not signed over the deed to me without which the mortgage company refused to transfer the mortgage to me. So it's been a back-and-forth battle with that. He hasn't signed over the land in Texas, and he has not signed over the business to me either like he was supposed to.

Q: And would you have signed the divorce – consent to divorce papers if you knew [Jelassi] was not going to sign the postnuptial agreement?

A: Absolutely not.

Q: And was it your understanding that nothing would be sent until that was signed?

A: Yes.

* * *

THE COURT: I think you may have referenced 2014 initially. But this was filed in 2013.

THE WITNESS: It might have been '13. I'm – yeah. I'm not actually sure on the exact dates. I don't even have the final decree — I don't have the final decree.

THE COURT:    You've never received that?

THE WITNESS: No.  No.

*Id.* at 10-12.

After Vulakh waived her attorney-client privilege on the record, and the court noted on the record that Attorney Grannan had appeared as counsel for Jelassi in the divorce complaint, Attorney Grannan testified.  He acknowledged that he had represented both parties during the divorce proceedings, *id.* at 13, and testified that he did prepare the agreement at Vulakh's request:

> Q: And was that accurate for the way she described things occurring with your office sending everything in but not including a signed postnuptial agreement?
>
> A: We did prepare the – I don't recall what we titled it, whether it was a separation agreement or a postnuptial agreement.  We did prepare that at [Vulakh's] request, and those were – the terms were specified by [Vulakh].
>
> Q: And was it your understanding that she intended to agree to the divorce based on that being included as part of the petition for divorce—complaint for divorce and that that was – she considered it all to be an entirety, not a divorce without the equitable distribution?
>
> A: At the outset, definitely.  During the course of the divorce, things became very contentious and she became very frustrated with both Mr. Jelassi and the process overall.  But ultimately she wanted a divorce.  That was the priority to her as well as to Mr. Jelassi.
>
> Q: And do you recall telling her that it as a mix-up in your office that caused everything to be filed without signatures on that?
>
> A: I don't recall that at all.
>
> Q: Is it possible that that occurred?

A: No. If I were to plead equitable distribution, I think I would have to do that in Philadelphia. My – during the course of my representation, the timing of the distribution of the assets changed considerably. At the outset it was to be completely done, settled and over before any divorce decree was granted. That changed.

Q: Okay. And in what way did that change?

A: Both of them became extremely confrontational and agitated. My contact with [Vulakh] increased. My contact with [Jelassi] decreased. It became very clear to me he was not going to sign anything. And I conveyed that to [Vulakh].

Q: Do you recall her contacting you after the fact, after the filing of the divorce complaint, to find out what the status was?

A: Yes, when I told her she was divorced, shortly after the decree was issued.

Q: Did [Vulakh] ever contact you about the property issues not being included?

A: Yes.

Q: And what did you tell her at that time . . . What did you tell her when she contacted you about the property issues not being included?

A: I told her that I'd be happy to testify at any hearing that was conducted [on] this about the communications, about her intentions and about what actually happened.

*Id.* at 13-16.

Attorney Grannan also testified there were several versions of the postnuptial agreement, and that it changed slightly a few times, "but it was always – the main thing was the business and the house." *Id.* at 19. "[T]he land in Texas . . was not a main factor for either person really. I mean, they mentioned it, but it was the business and the house." *Id.*

On the record, the court clarified the following:

> Q: So just so I'm clear, despite the fact that there were these ongoing negotiations about property distribution, at no time was there ever a claim raised of record on behalf of either Mr. Jelassi or Ms. [Vulakh] in terms of equitable distribution[?]
>
> A: No.  If we were going to raise equitable distribution, we would have had to do that in Philadelphia because if there's going to be a hearing, as I learned today, that's quite a drive [from Cameron County].
>
> Q: It is, but we certainly over the years have addressed jurisdiction over equitable distribution claims raised here. Enforcement may have to be someplace else[.]

*Id.* at 19-20.

The court continued to question Attorney Grannan on the issue of property distribution:

> Q: And did [Vulakh] make clear to you that she wanted to promote or have the property distribution claims addressed?
>
> A: At the outset, yes, and then afterwards, absolutely.
>
> Q: So to your knowledge Ms. Vulakh always wanted to have the ability to have a Court determine distribution of the marital estate.
>
> A: **Oh, at one point during the divorce she just said, I just want a divorce.  I remember that very clearly.**
>
> Q: **But do you ever remember her wavering from that claim or that request to have the property also subject to distribution?**
>
> A: **Yes, when she said, I want – I just want a divorce.**

*Id.* at 21 (emphasis added).

- 10 -

Following the hearing, the trial court issued findings of fact and conclusions of law, and denied Vulakh's motion to vacate. The court found that the complaint in divorce, filed on November 7, 2013, did not include a claim for equitable distribution. *See* Findings of Fact, 4/19/16, at 1; Complaint in Divorce, 11/7/13. Further, the court found that Vulakh had informed Attorney Grannan that she wanted the issue of marital property distribution resolved, and "at other times that she simply wanted a divorce without the resolution of equitable distribution." Findings of Fact, 4/19/16, at 2. The court also found that on February 12, 2104, Vulakh signed the affidavit of consent, *id.* at 2, which included the following language: "**I understand that I may lose rights concerning alimony, division of property, attorneys' fees or expenses if I do not claim them before a divorce is granted**." Affidavit of Consent, 2/12/14 (emphasis added). Additionally, the court found Attorney Grannan had filed a notice of intention to file a praecipe to enter a divorce decree, docketed on March 14, 2014, and that Vulakh signed an affidavit of acceptance of service of that notice, consented to entry of a final divorce decree, and verified that she understood that she could lose rights concerning division of property if not claimed before the divorce decree was entered. Findings of Fact, 4/19/16, at 2. The court found that the final decree in divorce, dated March 24, 2014, docketed on April 11, 2014, did not incorporate the postnuptial agreement. *Id.* Finally, the court found that the postnuptial agreement,

dated March 18, 2014, which was included in Vulakh's August 5, 2015 petition, was unsigned. ***Id.***

First, we note our standard of review. This Court will review an order denying a petition to open or vacate a divorce decree for an abuse of discretion. ***Danz v. Danz***, 947 A.2d 750, 752 (Pa. Super. 2008). ***See also Foley v. Foley***, 572 A.2d 6, 9 (Pa. Super. 1990).

In ***Justice***, this Court observed the general power of the trial court to effectuate a fair and just determination of property rights, but explained that extrinsic fraud must be established in order for the court to act beyond 30 days. Here, Vulakh has failed to prove conduct on the part of Jelassi, or on the part of Attorney Grannan, that amounts to extrinsic fraud. Thus, there was no basis for a finding of fraud that would permit the court to vacate the divorce decree. ***See Ratarsky v. Ratarsky***, 557 A.2d 23 (Pa. Super. 1989) (distinction between extrinsic fraud, i.e., fraud which relates to collateral matter, a consequence of which is to prevent a fair hearing, and intrinsic fraud, i.e., a matter relating to adjudication of the judgment) citing ***McEvoy v. Quaker City Cab Co.***, 110 A. 366, 368 (Pa. 1920).

Here, Vulakh had fair opportunity for a hearing and presentation of her case. Jelassi refused to execute the proposed postnuptial agreement, in fact neither party signed it; but despite this, Vulakh ultimately signed consent for entry of the divorce decree and a waiver of her rights. Because Vulakh has not advanced an argument that could justify a finding of extrinsic fraud, lack of jurisdiction over the subject matter, or a fatal defect apparent on the face

of the record within the meaning of 23 Pa.C.S.A. § 3332, we are constrained to conclude that the trial court properly denied her petition to vacate the divorce decree. ***Flowers v. Flowers***, 612 A.2d 1064 (Pa. Super. 1992).[4]

---

[4] We do find it troubling that Attorney Grannan did not have the parties sign a waiver of conflict of interest. ***See*** Findings of Fact, ***supra*** at 2. Pennsylvania Rule of Professional Conduct 1.7 provides:

Rule 1.7.  Conflict of Interest: Current Clients

> (a)  Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:
>
> > (1)  The representation of one client will be directly adverse to another client; or
> > (2)  There is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b)  Notwithstanding the existent of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:
>
> > (1)  The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> > (2)  The representation is not prohibited by law;
> > (3)  The representation does not involve the assertion of a claim by one client against another client representation by the lawyer in the same litigation or other proceeding before a tribunal; and
> > (4)  Each affected client gives informed consent.

Pa. Rules of Professional Conduct, 1.7.  "The client's consent need not be confirmed in writing to be effective.  Rather, a writing tends to impress upon

*(Footnote Continued Next Page)*

- 13 -

Order affirmed.

Judge Dubow joins the Memorandum.

Judge Strassburger files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/30/2017

*(Footnote Continued)* ———————————

clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing." Rule 1.7- Explanatory Comment.